**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **VALERIE JONES,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 06 C 3870** |
| **v.** ) | **Mag. Judge Michael T. Mason** |
| ) | |
| **JO ANNE B. BARNHART,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Claimant, Valerie Jones ("claimant"), has brought a motion for summary

judgment seeking judicial review of the final decision of the Commissioner of Social

Security ("Commissioner") denying her claim for Disability Insurance Benefits under §§

216(I) and 223 of the Social Security Act (the "Act"), codified as 42 U.S.C. §§ 416(I) and

423(d). The Commissioner filed a cross-motion for summary judgment asking this

Court to uphold the final decision of the Administrative Law Judge ("ALJ"). We have

jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth

below, claimant's motion is granted and the Commissioner's motion is denied. This

matter is remanded for further proceedings consistent with this opinion.

**BACKGROUND**

**I.      Procedural History**

Claimant filed an application for disability insurance benefits on July 21, 2004,

alleging a disability onset date of March 2, 2001. (R. 63-64, 74-76). Claimant's

1

application was initially denied by notice dated February 17, 2005, and after a request for reconsideration, by notice dated July 15, 2005. (R. 25-28, 32-34). Claimant then filed a timely request for a hearing. (R. 36). On January 18, 2006, a hearing was held in front of ALJ Denise McDuffie Martin in Orland Park, Illinois. (R. 222-62). Claimant; Dr. William Newman, a medical expert ("ME Newman"); and Glee Ann Kehr, a vocational expert ("VE Kehr"), appeared and testified at the hearing. (*Id.*) ALJ Martin issued a written decision denying claimant's request for benefits on January 20, 2006. (R. 15-22). The ALJ found claimant had established the existence of spinal stenosis accompanied by obesity. (R. 21). However, ALJ Martin found this impairment, while severe, is not one which the Commissioner considers conclusively disabling. (*Id.*) She further found that claimant is capable of performing sedentary work. (*Id.*) The Appeals Council then denied claimant's request for review and the ALJ's decision became the final decision of the Commissioner. (R. 3-5); *see Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). Claimant subsequently filed this action in the district court.

## II.    Claimant's Testimony

Claimant was born on January 15, 1971. (R. 66). At the time of the hearing, she was 36 years old and living in a trailer with her four-year-old twins. (R. 227-28, 242). She stands 5'3" tall and weighs approximately 289 pounds. (R. 234). Claimant has a high school education and has completed some college. (R. 228). Claimant testified that she is enrolled in telecourses through a local community college, which involves watching videos and reviewing course books at home, and then going to the school once a month to take a test. (R. 228-29, 248-49).

Claimant testified that she has not worked since March 2001. (R. 230). For

approximately six and a half years before that date, she was a full-time independent living counselor for Trinity Services. (*Id.*) That job involved assisting adults with special needs with tasks such as meal preparation, personal care, transportation and other activities of daily living. (*Id.*) Prior to that time, claimant worked as a gas station attendant, babysitter, preschool teacher, and dishwasher. (R. 231-32).

Claimant testified that she stopped working in 2001 because she had problems with her back and, after she became pregnant, "the doctor said I don't want you working. It's just too much stress, too much problem." (R. 230-31). She further stated that her back problems started in 1999, when she injured her back while assisting a patient in a wheelchair into a car. (R. 232-33). According to claimant, the patient started to fall and claimant injured her back as she reached over to catch the patient. (R. 233). Claimant stated that between 1999 and 2001 she received a lot of physical therapy; saw her primary physician, Dr. Stephen Wadowski, many times; and took various medication. (*Id.*) Claimant also stated that she hurt her back a few more times while still working at Trinity Services and had to miss quite a bit of work "for back problems." (*Id.*)

Claimant testified that she suffers from lower back pain accompanied by pain and tingling in both legs. (R. 235-36). According to claimant, this pain is aggravated by standing up straight, walking, and sitting for extended periods of time. (R. 236-37). As a result, she is more comfortable leaning forward or to the right when sitting. (R. 237-38, 255). Claimant takes Darvocet every six hours, which prevents the pain from going further down her legs and helps to control the pain by numbing it. (R. 238). She testified that the pain in her right leg is "a little worse," which causes her to "lean to the

3

right [and] . . . put most of the weight on the left" leg. (R. 236). Claimant stated that she does not use a cane, crutch, or walker because it would be impossible for her to handle her two children while using one of those devices. (R. 236-37). Claimant also suffers from muscle spasms, which cause a jerking motion in her legs, occasionally accompanied by a shooting pain in her back. (R. 237-39). At the hearing, claimant testified that she continues to experience muscle spasms, although the pain from these spasms has decreased. (R. 239).

According to claimant, her pain is aggravated from bending, lifting, turning, stooping, and twisting from side to side. (R. 240-41). Claimant stated that she can only stand for 15 minutes before the pain starts shooting down her legs and she gets hot, sweaty and nauseous. (R. 241). Claimant did not experience any of these symptoms prior to the onset of her back pain. (*Id.*) Finally, claimant testified that sitting straight up in a chair for longer than ten minutes makes her feel nauseous. (R. 255).

Claimant reported that she received two injections in her back, after which "the pain was relieved for about two, three days." (R. 250-51). According to claimant, Dr. Wadowski suggested that she talk to a neurosurgeon about the possibility of shaving the disc to relieve some of the pressure. (R. 235). While claimant was not able to find a neurosurgeon close to her home, she remains willing to talk to a neurosurgeon about possible surgery. (*Id.*)

Claimant also testified about her depression. (R. 241-42). She has been taking Prozac for the past four to six years, and stated that it seems to control her depression. (R. 242). She claimed that her depression is affected by her pain, specifically her inability to work and do the "normal things" in life. (*Id.*)

4

According to her testimony, claimant's typical day involves preparing her children for school, taking her children to and from the bus stop, doing light cleaning, feeding and bathing her children, and getting them ready for bed. (R. 244-45). Throughout the day, claimant frequently lays down and rests, often for hours at a time. (R. 244-45, 251). Claimant stated that if she is not able to lie down during the day, she experiences pain and usually takes an additional dose of Darvocet. (R. 251-52). Claimant testified that while washing dishes and cooking, she has to sit in a chair because standing is too painful. (R. 246-48). Claimant admitted that she receives a lot of help with caring for her children, cleaning, and grocery shopping from her parents, brother, and some friends. (R. 242-43, 246-47, 253). Before going to bed, claimant reads and watches the videos for her telecourses. (R. 248-49). Claimant stated that she has difficulty sleeping at night because of the pain in her back, and generally sleeps for only four to five hours. (R. 239-40). As a result, Dr. Wadowski prescribed Zanac. (R. 240).

### III.    Medical Evidence

In support of her disability claim, claimant submitted medical records from Dr. Wadowski, who began treating her in July 25, 1996. (R. 135-69, 211-21). According to those records, claimant received treatment for lower back pain and depression from Dr. Wadowski, or other physicians in his office, approximately every three to six months from 1996 through 2004. (R. 138). During the course of his treatment of the claimant, Dr. Wadowski diagnosed severe spinal stenosis at L5-S1, spondylolisthesis, degenerative joint disease, and disc bulging at L5, as well as depression. (R. 136, 138, 212). Claimant alleges that she became disabled on March 2, 2001 as a result of these conditions. (R. 15, 74-76).

On April 24, 1997, almost four years before her onset date, claimant underwent a spine lumbar 5 view exam at Silver Cross Hospital.  (R. 167).  The exam showed good alignment of the vertebral bodies with intervertebral disc spaces well maintained.  (*Id.*)  Neither spondylolisthesis nor spondylolysis were noted.  (*Id.*)

On September 22, 1999, claimant had another spine lumbar 5 view exam.  (R. 166).  When compared to the April 24, 1997 radiographs, this exam showed very minimal rotary lower lumbar scoliosis, as well as degenerative disc space narrowing and sclerotic bony changes evident at the lumbosacral region.  (*Id.*)  The radiologist also noted a Grade I anterior spondylolisthesis of L5 upon S1 with associated spondylolysis defect questioned.  (*Id.*)

On December 31, 1999, claimant sought treatment from Dr. Wadowski and reported that she was "pulled" by a patient at work and strained her back muscle.  (R. 157).  Claimant informed Dr. Wadowski that she had pain in her left lower back, which was worse when getting out of bed.  (*Id.*)  She also stated that the night before her legs began to tingle, although she was not experiencing leg tingling at that time.  (*Id.*)  Claimant also told Dr. Wadowski that the leg tingling had happened before.  (*Id.*)  Dr. Wadowski prescribed a lumbar strap, periodic use of an ice wrap, and Lodine.  (R. 157).

Claimant returned to Dr. Wadowski for treatment on March 7, 2001, five days after the alleged onset of her disability.  (R. 154).  Her medical records from March 2001 through June 2002 do not reference claimant's back pain, but rather discuss her treatment for sinitus and post partum depression.  (R. 152-54).   On August 6, 2002, Dr. Wadowski diagnosed claimant with right hip sciatica and lower back pain.  (R. 151).

The Patient Progress Notes from claimant's November 7, 2003 visit note

complaints of "sciantica in back, pain shooting down back of legs" and that claimant had "applied for disability." (R. 149). The legible portions of Dr. Wadowski's diagnosis indicate an "L 5 sprain." (*Id.*) On November 10, 2003, Dr. Wadowski ordered claimant to undergo an "[o]pen MRI of the LS spine" and noted a diagnosis of a lumbosacral sprain and sciantica. (R. 148). Dr. Wadowski also noted that claimant complained of pain radiating to both legs. (R. 147).

Claimant returned to Dr. Wadowski on April 20, 2004 to discuss her back pain and weight. (R. 144). Claimant reported that her back pain had improved slightly, but she still had pain radiating to both legs and muscle spasms. (*Id.*) She also reported that she had been unable to lose weight, despite trying various diets and weight loss products, and requested to talk to a surgeon about gastric bypass surgery. (*Id.*) At that time, claimant reported frequent back pain and pain associated with walking, but denied leg limps and neck pain. (*Id.*) Dr. Wadowski's physical examination revealed that claimant was obese, had an even gait, and had lumbar spine and lower back muscle tenderness, as well as tenderness of the L4 and L5. (R. 145). The examination also revealed muscle spasms, but no SI joint tenderness. (*Id.*) Dr. Wadowski recommended an open magnetic resonance imaging scan ("MRI") of the spine. (R. 145, 164). He also advised dietary changes, exercise, weight loss and an appointment with a dietician to combat claimant's morbid obesity and prescribed Naproxen and Prozac for her depression. (R. 145).

Claimant underwent the MRI on August 5, 2004. (R. 165). The MRI revealed "[m]oderately severe spinal stenosis at L5-S1 related to spondylolisthesis and disc bulging with superimposed disc protrusion . . . [b]ilateral spondylolysis at L5 . . . [and]

L4-L5 facet joint degenerative change." (*Id.*) On August 9, 2004, Dr. Wadowski reviewed the results of the MRI exam and diagnosed severe spinal stenosis at L5-S1 related to disc bulging and spondylolisthesis. (R. 142). At that time, claimant stated she was still experiencing pain in her lower back, which Dr. Wadowski described as "radiating to both posterior lower legs . . . [and] aggravated by all positions." (*Id.*) Dr. Wadowski examined claimant and found tenderness at L4, L5, and S1, and lower back muscle tenderness and muscle spasms. (R. 143). Dr. Wadowski prescribed Darvocet for the lumbar disc displacement and continued claimant's prescriptions of Naproxen and Prozac. (*Id.*) He also recommended an appointment with a neurosurgeon and pain clinic. (*Id.*) An undated prescription filled out by Dr. Wadowski indicates that claimant needed to see a neurosurgeon at Christ Hospital, because neurosurgeons in Joliet do not take public aid. (R. 163).

Also on August 9, 2004, Dr. Wadowski completed a physical residual functional capacity ("RFC") assessment of claimant for the State of Illinois Department of Human Services. (R. 138-41). He reported that claimant's capacity for sustained physical activity was more than 50% reduced for walking, standing, stooping, sitting, climbing, pulling, and traveling, and was up to 20% reduced for bending, turning, and pushing. (R. 141). Dr. Wadowski determined that claimant had more than 50% reduced capacity for performing physical activities of daily living, and that she could lift no more than 10 pounds at a time. (*Id.*) Finally, he found claimant's restriction of daily living activities was moderate, but that she had mild difficulties functioning socially and maintaining concentration, persistence, or pace. (*Id.*)

Dr. Robert Patey, a state agency physician, reviewed the medical evidence and

completed an RFC assessment of claimant on January 8, 2005. (R. 170-77). After reviewing the evidence in claimant's medical file, Dr. Patey concluded that she had a primary diagnosis of "Spondylolisthesis - L5/S1 Stenosis" and a secondary diagnosis of "[c]hronic back pain." (R. 170). Dr. Patey found exertional limitations caused by claimant's "degenerative changes with chronic pain in lumbar region of back." (R. 171). Specifically, Dr. Patey opined that claimant could occasionally lift and/or carry 20 pounds and could frequently lift and/or carry 10 pounds. (*Id.*) Dr. Patey opined that claimant could stand, walk, or sit for a total of approximately 6 hours in an 8 hour workday, due to limitations related to degenerative changes with chronic back pain in the lumbar region of her back. (*Id.*) He also found that claimant could never climb ladders, ropes or scaffolds, but that she could occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl. (R. 172). Dr. Patey further indicated that claimant could balance frequently. (*Id.*) Dr. Patey concluded that claimant could "perform light exertional duties with noted postural limitations." (R. 177). He opined that claimant "has significant, chronic back pain due to spinal stenosis which is secondary to spondylolisthesis" and found that her complaints of back pain were reasonable given her condition. (*Id.*) On July 12, 2005, Dr. Frank Norbury reviewed Dr. Patey's RFC assessment and affirmed it as written. (R. 208-09).

A psychiatric review was performed by a Disability Determination Services ("DDS") physician, Dr. Joseph Mehr, on February 3, 2005. (R. 178-91). Dr. Mehr found that claimant had a history of depression controlled by Prozac. (R. 181). Dr. Mehr noted that claimant had no restrictions on her daily living activities and no difficulties in maintaining concentration, persistence, or pace, but found that she experienced mild

difficulties functioning socially.  (R. 188).  This assessment was reviewed and affirmed by Dr. Kirk Boyenga on July 13, 2005.  (R. 206-07).

On May 2, 2005, claimant again sought treatment from Dr. Wadowski.  (R. 219-21).  At that time, claimant reported worsening lower back pain, described as mild to severe in intensity; aggravated by bending, lifting, pulling, and pushing; and radiating to both lower legs with numbness and tingling bilaterally.  (R. 219).  On physical examination, Dr. Wadowski noted that claimant was obese and her gait was even.  (R. 220).  He continued to prescribe Darvocet for lumbar disc displacement and depression. (R. 220-21).

On July 8, 2005, Dr. Joseph Cools, another DDS physician, performed a second psychiatric review assessment.  (R. 192-205).  Dr. Cools concluded that there was insufficient evidence to diagnose claimant's medical disposition (R. 192) or rate her functional limitations.   (R. 202).  Dr. Cools found a medically determinable impairment that did not precisely satisfy the relevant diagnostic criteria, specifically a "previous history of depression."  (R. 195).

On August 30, 2005, Dr. Wadowski examined claimant and completed a second RFC assessment for the State of Illinois Department of Human Services.  (R. 212-15). He noted that claimant's chief complaints were lower back pain, lumbar muscle spasms, and sciatica.  (R. 212).  Dr. Wadowski diagnosed claimant with spinal stenosis, spondylolisthesis and disc protrusion, depression, sciatica, and anxiety.  (*Id.*)  With regard to claimant's capacity for sustained physical activity, the doctor determined that she could walk, but could not bend, stoop, climb, push, or pull, and that she was "only able to stand for 15 minutes."  (R. 215).  He also noted that she could sit "ok."  (*Id.*)  Dr.

Wadowski opined that claimant could perform all physical activities of daily living, "but [it] takes longer." (*Id.*) He concluded that she could lift no more than 10 pounds at a time during an 8 hour day, 5 days per week. (*Id.*) Dr. Wadowski noted that Prozac had improved claimant's depression. (*Id.*) He opined that the depression did not limit claimant's daily living activities or social functioning, but found her concentration decreased when she experienced severe pain. (*Id.*)

On October 24, 2005, claimant returned to Dr. Wadowski's office for treatment. (R. 211). Claimant reported that her pain was aggravated by bending, lifting, turning, and stooping. (*Id.*) Dr. Wadowski, or another physician in his office, noted that claimant had tenderness at L4, L5, and S1, as well as sacroiliac joint tenderness. (*Id.*) The doctor diagnosed spinal stenosis and muscle spasm and stated that claimant should not lift more than 15 pounds. (*Id.*) The doctor also found that claimant's depression and anxiety were stable and recommended a follow up appointment in two months. (*Id.*)

## IV.    Medical Expert's Testimony

ME Newman reviewed claimant's medical records and testified at the hearing. (R. 255-57). ME Newman opined that claimant suffered from spondylosis and it was "very possible" that claimant's spondylosis occurred at the time she fell in 1999. (R. 256). He noted that claimant had a bulging disc, has been pregnant, has two little kids to take care of, and has gained a lot of weight, all of which are "reasons for [claimant] becoming more symptomatic." (*Id.*) ME Newman further testified that claimant's back problems could be symptomatic or not symptomatic. (R. 257).

ME Newman opined that claimant's condition does not meet or equal a listed impairment. (R. 256). He concluded that claimant would be restricted to sedentary

work, due to her weight and the fact that she has a reason for having pain.  (*Id.*)
However, ME Newman stated that there were no other work-related limitations, as there
was no neurological deficit.  (*Id.*)  ME Newman also noted that claimant has depression
and opined that depression is not physical.  (R. 257).

## V.      **Vocational Expert's Testimony**

VE Kehr also testified at the hearing.  (R. 257-61).  VE Kehr concluded that
claimant's past relevant work as an independent living counselor in a group home was
"medium in physical demand and semi-skilled in nature."  (R. 258).  She opined that this
work is not transferrable because claimant did not receive any specific education or
training.  (*Id.*)  VE Kehr described claimant's work as a cashier at a gas station as light
and unskilled work, her work as a daycare provider as light to sedentary and semi-
skilled, and her work as a kitchen helper as medium and unskilled work.  (*Id.*)

The ALJ asked VE Kehr to consider a hypothetical individual with the same age,
education and work experience as the claimant who was limited to sedentary work with
the following conditions: the individual could not climb ladders, ropes or scaffolds; she
could occasionally climb ramps and stairs; and she could occasionally stoop, kneel,
crouch and crawl.  (*Id.*)  VE Kehr testified that this hypothetical individual would not be
capable of doing any of claimant's past work.  (R. 258).  However, VE Kehr testified that
such an individual could perform other jobs in the national economy.  (*Id.*)  VE Kehr
stated that within the Chicago metro area and surrounding counties, there are 4,000
account clerk jobs and 6,000 order clerk jobs that this individual could perform.  (*Id.*)

VE Kehr opined that if the hypothetical individual could not occasionally bend or
stoop, there would be no work that the individual could perform.  (R. 258-59).  This is

because bending or stooping is required to access a work station, whereas climbing, crawling, and crouching don't have much of an effect on the individual's ability to perform the sedentary functions of their job. (R. 259). VE Kehr testified that if the hypothetical individual had the ability to alternate between sitting and standing every half hour, the number of account clerk positions would not change, however there would be roughly a 25 percent reduction in the order clerk positions. (*Id.*) VE Kehr stated that while the pace of a clerk's duties depends on the shift, the hypothetical individual would be expected to accommodate the faster shifts. (R. 260). She further stated that there are no jobs which would allow the individual to lay down for 20 minutes in the course of an eight-hour work day. (*Id.*) Finally, VE Kehr opined that an employer would not require a full-time employee to sit up straight, as long as the employee could talk on the phone, access their work station, and complete their work. (R. 261).

**LEGAL ANALYSIS**

**I.      Standard of Review**

We must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir.1995), *quoting Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971). We must consider the entire administrative record, but we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003), *quoting Clifford v. Apfel*, 227 F.3d

863, 869 (7th Cir. 2000).  We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues."  336 F.3d at 539, *quoting Steele*, 290 F.3d at 940.  While the ALJ "must build an accurate and logical bridge from the evidence to conclusions," she need not discuss every piece of evidence in the record.  *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  Rather, the ALJ must "sufficiently articulate [her] assessment of the evidence to 'assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning.'"  *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (*per curiam*), *quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985).

## II.     Analysis Under the Social Security Act

Whether a claimant qualifies to receive disability insurance benefits depends on whether the claimant is "disabled" under the Social Security Act.  A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether [s]he can perform [her] past relevant work, and (5) whether the claimant is capable of performing any work in the national

14

economy." *Dixon*, 270 F.3d at 1176.  The claimant has the burden of establishing a disability at steps one through four.  *Zurawski*, 245 F.3d at 885-86.  If the claimant reaches step five, the burden shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy."  245 F.3d at 886.

ALJ Martin followed this five-step analysis.  At step one, the ALJ found that claimant had not engaged in substantial gainful activity since the alleged onset date of March 2, 2001.  (R. 16).  At step two, ALJ Martin found that claimant's impairments of spinal stenosis and obesity are considered to be severe in that they imposed more than minimal restrictions on her ability to perform basic work-related activities.  (R. 17).  The ALJ also found that claimant has a depressive disorder "which is a nonsevere impairment in that it is controlled and improved to mild with medication." (*Id.*)  At step three, the ALJ determined that claimant does not have an impairment, or any combination of impairments, that meets or equals the criteria of any impairment listed in the regulations.  (*Id.*)  ALJ Martin then considered claimant's symptoms, including her pain, and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidenced.  (*Id.*)  Based on this review, ALJ Martin found claimant is "more limited than assessed by the DDS reviewers but nevertheless has the residual functional capacity for sedentary work."  (R. 18).  Thus, at step four, the ALJ concluded that claimant has the functional capacity to perform sedentary work but could not perform her past relevant work because it required more than sedentary physical exertion.  (R. 19-20).  Finally, at step five, ALJ Martin found that the Commissioner met its burden to show claimant was "capable of making a successful adjustment to work that exists in significant numbers in the national economy."  (R. 21).

Accordingly, she found that claimant is "not disabled" under the Act. (*Id.*)

Claimant argues that ALJ Martin's decision is not supported by substantial evidence because the ALJ erred in: (1) rejecting the opinion of claimant's treating physician as to the functional limitations caused by her condition; and (2) failing to find claimant's testimony regarding her symptoms, including the severity and frequency of her back and leg pain, to be fully credible. We agree.

## III. The ALJ's Analysis

### A. The ALJ Failed to State Logical Grounds for Rejecting the Opinion of Claimant's Treating Physician

The Court finds that ALJ Martin failed to state logical grounds, based on the evidence, for rejecting the views of claimant's treating physician. Under the applicable regulations, the ALJ is required to explain the weight given to the opinions of claimant's treating physicians. 20 C.F.R. § 404.1527(d)(2) (stating that "we will always give good reason in our notice of determination or decision for the weight we give your treating source's opinion.") Generally, the opinion of a treating physician who is familiar with the claimant's impairments, treatments, and responses should be given great weight in disability determinations. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). Moreover, when the record contains the opinions of treating physicians and non-examining physicians, courts have agreed that the opinions of treating physicians must be given extra weight. *Grindle v. Sullivan*, 774 F. Supp. 1501, 1508 (N.D.Ill. 1991). If the ALJ does not give the treating physician's opinion controlling weight, she is required to explain the weight given to the opinions of State agency medical consultants or other program physicians. 20 C.F.R. § 404.1527(f)(2)(ii).

Here, ALJ Martin outlined the medical evidence she considered, including opinions from State agency medical consultants who reviewed the file on January 8, 2005, February 3, 2005, July 8, 2005, July 12, 2005, and July 13, 2005; reports from claimant's treating physician, Dr. Wadowski, dated August 9, 2004, May 2, 2005, August 30, 2005, October 24, 2005; and RFC questionnaires for the State of Illinois completed by Dr. Wadowski. (R. 17-19). The ALJ specifically rejected Dr. Wadowski's conclusions regarding claimant's severe pain when sitting, standing, and walking and claimant's fifty percent reduced capacity for walking, standing, stooping, sitting, climbing, pulling, traveling, and performing activities of daily living. (R. 19). Rather, ALJ Martin found that these conclusions were inconsistent with Dr. Wadowski's statements regarding claimant's ability to sit, stand, and walk. (R. 18). The ALJ found Dr. Wadowski's conclusions regarding claimant's functional limitations were likely based on claimant's own assertions since the findings on physical examination were generally unremarkable, with no specific evidence of a neurological deficit. (*Id.*) The ALJ also noted that in his August 30, 2005 report, made at a time when claimant asserted a worsening in her condition, Dr. Wadowski reported that she could stand for fifteen minutes, could walk and sit, and could lift up to ten pounds. (R. 18-19). Relying on these inconsistencies, ALJ Martin elected not to "assign controlling weight to his statements with regard to severe pain when sitting, standing and walking or with regard to more than a 50 percent reduced capacity for walking, standing, stooping, sitting ... and performing activities of daily living." (R. 19).

The ALJ failed to state logical grounds for rejecting Dr. Wadowski's opinions. This is especially troubling because ALJ Martin found "the limitations described by Dr.

Wadowski in August of 2005 to be a more accurate reflection of claimant's functional capabilities." *(Id.)* Paradoxically, the ALJ also found that Dr. Wadowski's assessment was "not inconsistent" with the RFC that she found. *(Id.)* ALJ Martin does not provide an explanation for this finding.

ALJ Martin concluded that the functional limitations identified in Dr. Wadowski's treatment records were likely based on claimant's assertions, since the findings on physical examination were generally unremarkable, with no specific evidence of neurological deficit. *(Id.)* However, ALJ Martin did not mention Dr. Wadowski's reports of physical examination that consistently noted lower back muscle tenderness and tenderness of the L4, L5, and S1. (R. 143, 145, 211). Claimant's medical documentation also included the results of an MRI exam indicating severe spinal stenosis at the L5-S1 related to spondylolisthesis and disc bulging. (R. 165). ALJ Martin did not explain the weight accorded to claimant's MRI but merely held that the "findings on clinical examination have been consistent in showing that she does not have neurological deficits that would reasonably account for her allegations." (R. 19).

The ALJ also found that the treating physician's records were inconsistent, specifically with regard to claimant's ability to sit, stand and walk. (R. 18-19). However, the physical assessments filled out by Dr. Wadowski on August 9, 2004 and August 30, 2005 are not directly contradictory. Whereas Dr. Wadowski used responses of "A" through "D" to rate claimant's physical impairments on the August 9, 2004 assessment, Dr. Wadowski used responses of "Yes" and "No" to rate claimant's impairments on the August 30, 2005 exam. (R. 141, 215). Therefore, Dr. Wadowski's determination on the August 9, 2004 report that claimant has more than 50% reduced capacity for walking

18

("D") does not contradict his finding on the August 30, 2005 assessment that claimant can walk ("Yes").  (*Id.*)

In short, ALJ Martin failed to state logical grounds, based on the evidence, for rejecting the opinions of claimant's treating physician, Dr. Wadowski.  Failure to provide good reasons for discrediting a treating physician's opinion is grounds for remand.  *See Clifford*, 227 F.3d at 870.

### B.  The ALJ Failed to Adequately Explain the Weight Given to the Medical Opinions of the Reviewing Physician Consultants

Furthermore, the ALJ failed to articulate the weight given to the opinions of Dr. Patey, who reviewed claimant's medical documentation and performed an RFC assessment in January 2005 (R. 170-77), and Dr. Norbury, who affirmed Dr. Patey's conclusions.  (R. 208-09).  In rejecting the opinions of claimant's treating physician, ALJ Martin noted that claimant "is more limited than assessed by the DDS reviewers but nevertheless has the residual functional capacity for sedentary work." (R. 18). However, the ALJ did not explain the weight given to the opinions of the state agency medical consultants as required under 20 C.F.R. § 404. 1527(f)(2)(ii).  Accordingly, remand is appropriate.  *See Clifford*, 227 F.3d at 870; *see also Lucio v. Barnhart*, 2004 WL 1433637, *12-13, 2004 U.S. Dist. LEXIS 12207, *40-42 (N.D.Ill. 2004) (finding that the ALJ erred because he failed to articulate the weight given to the treating physician's opinion nor did he explain the weight given to the opinions of the consultative examiner or the State agency physicians).  On remand, the ALJ must clarify the weight given to each of the medical opinions in the record.

## IV.  The ALJ's Credibility Determination

Next, claimant contends that the ALJ erred in rejecting her credibility. To succeed on this ground, claimant must overcome the highly deferential standard that we accord credibility determinations. *See Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (holding that the credibility determinations of hearing officers are afforded special deference). Because the ALJ is in a superior position to assess the credibility of a witness, we will reverse an ALJ's credibility determination only if claimant can show that it was "patently wrong." 207 F.3d at 435. However, in evaluating the credibility of statements supporting a Social Security application, the ALJ must comply with the requirements of Social Security Ruling 96-7p. *Giles v. Astrue*, 483 F.3d 483, 488 (7th Cir. 2007). Under SSR 96-7p, the ALJ's "assessment of the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on [her] ability to function must be based on a consideration of all the evidence in the case record," including "medical signs and laboratory findings." SSR 96-7p.

Here, ALJ Martin based her credibility determination on a number of facts and observations. The ALJ noted that claimant had not received any epidural steroid injections, despite claimant's testimony that she had received two injections. (R. 19, 250). ALJ Martin also found that there was nothing in the medical records from claimant's treating physician to indicate that he had recommended any further diagnostic studies or referred her to a specialist, nor had claimant sought or received treatment from a specialist. (R. 19). ALJ Martin observed that claimant's medications, including Naproxen and Darvocet, are generally prescribed for the relief of mild to moderate pain. (*Id.*) Along the same lines, the ALJ found that the treatment claimant received was essentially routine in nature and there was no objective evidence or

suggestion from a treating source to support claimant's statement that she was only comfortable sitting in a leaning forward position. (*Id.*)

ALJ Martin also noted that the fact that claimant had not returned to work after the birth of her twins, one of whom has physical problems, "leaves open the possibility that childcare responsibilities may play a part in her claiming disability."[1] (R. 19). Further, the ALJ noted that claimant stopped working when she became pregnant, and, although she claimed to have done so on the advice of her doctor, there was nothing in the record to support this assertion. (*Id.*)

Based on all these factors combined, the ALJ found claimant's testimony regarding the severity and frequency of her back/leg pain was not fully credible. (*Id.*) ALJ Martin further concluded that "given the comments in his reports, it appears that the claimant often saw Dr. Wadowski in order to generate evidence for this application and appeal, rather than in a genuine attempt to obtain relief from the alleged disabling symptoms." (R. 19).

Claimant argues that the reasons stated by the ALJ for rejecting claimant's credibility do not withstand logical scrutiny. Specifically, claimant contends that ALJ Martin rejected her credibility on the basis of factual errors.

It is unclear if the ALJ was erroneous in finding that claimant never received any epidural steroid injections. (R. 19). However, the ALJ erred in finding that claimant's treating physician had not recommended any further diagnostic studies or referred her

---

[1]ALJ Martin emphasized that "this observation is only one among many being relied on in reaching a conclusion regarding the credibility of claimant's allegations and her residual functional capacity." (R. 19).

to a specialist.  (*Id.*)   Indeed, Dr. Wadowski recommended that claimant make an appointment with a neurosurgeon and pain clinic.  (R. 143, 163).  Claimant argues that this factual mistake is grounds for remand.

Where the ALJ has erred in her analysis of the facts, remand is appropriate if there is reason to believe that a different result might ensue.  *Prak v. Chater*, 892 F. Supp. 1081, 1087 (N.D.Ill. 1995), *citing Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989).  ALJ Martin stated that she based her credibility determination in part on the failure of claimant's treating physician to refer her to a specialist or for further care.  (R. 19).  Had the ALJ correctly reviewed the evidence, she might have found claimant's testimony regarding the severity and frequency of her pain to be fully credible.

Claimant also contends that the ALJ disregarded, without explanation, medical evidence supportive of claimant's position.  An ALJ is not required to address every piece of testimony and evidence.  *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985).  However, an ALJ may not select and discuss only that evidence which favors her ultimate conclusion, but must articulate, at some minimum level, her analysis of the evidence to allow the reviewing court to trace the path of her reasoning.  *Diaz*, 55 F.3d at 307.

The Court finds that the ALJ failed to consider claimant's credibility in light of the entire case record.  In particular, ALJ Martin does not indicate whether she considered the medical evidence from claimant's treating physician or the reviewing physician consultants in making her credibility determination.  For example, the ALJ found that claimant's testimony regarding the severity or frequency of back/leg pain was not fully credible (R. 19), even though the state agency reviewing physicians found claimant's

complaints of back pain reasonable given her condition. (R. 177, 208-09). Similarly, the ALJ did not address claimant's MRI report except in the context of noting that the findings on clinical examination were consistent in showing that claimant did not have neurological deficits that would reasonably account for her allegations. (R. 19). As a result, ALJ Martin's credibility determination cannot stand. On remand, the ALJ must consider the entire record when determining whether claimant's testimony is fully credible.

**CONCLUSION**

For the reasons set forth above, claimant's motion for summary judgment is granted. The Commissioner's motion for summary judgment is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this opinion. It is so ordered.

**ENTER:**

_Michael T Mason_

**MICHAEL T. MASON**
**United States Magistrate Judge**

**DATED: March 27, 2008**